Okay, the next case is 523-0841, Davis v. Southern Illinois Hospital Services et al. The appellant is Mr. Kojic? Sayas. Sayas. Apologize. No worries, Your Honor. I've heard it all. I'm sure you have. I have a very simple name and they screw it up all the time. You're exactly right, so I guess it doesn't make a difference, does it? Well, I appreciate you asking. Okay, when you're ready, please proceed. May it please the Court. My name is Nick Sayas, Counsel for Appellants, Southern Illinois Hospital Services and Southern Illinois Medical Services. For simplicity's sake, I'll refer to them collectively as SIH, as we have in our briefing. This case arises out of a plaintiff having received all the benefits of his employment agreement with SIH, seeking to extricate himself from the last remaining obligation under the agreement, the enforceable non-compete provision. In granting summary judgment in favor of the plaintiff and in declaring the covenant not to compete unenforceable, the trial court inappropriately substituted its judgment for that of the parties, thereby thwarting the express intent of the agreement. This Court should reverse the judgment below for three reasons. First, because the trial court erred in holding that the parties' covenant not to compete was null and void by virtue of SIH's letter dated June 1, 2022, notwithstanding the fact that the parties continued to perform under the agreement through its natural conclusion on October 31, 2022. Second, because the trial court misapplied Illinois non-compete law to substantiate its alternative holding, that the restrictive covenant in this case was unreasonable and therefore unenforceable. And third, because the trial court erred in granting attorneys' fees to plaintiffs who did not seek enforcement of the contract and, in any event, should not stand as a prevailing party considering the Court's other errors. Look at the four corners of the agreement. The intent of the parties is clear. The contract provided for an initial term of five years beginning November 1, 2011. It then provided for two, and only two, renewal terms for a period of three years each. Assuming neither party gave notice to non-renew, those two renewal terms of three years would expire October 31, 2022. Third, the contract provides for restrictive covenants, including a non-compete provision, that in Section 6.4 of the agreement all parties expressly agreed was reasonable. The contract also says plainly that, as in unforeseen circumstances, outside of anyone's control, for example, familial hardships, SIH has a contractual right to enforce the covenant of non-compete unless SIH commits a material breach of the agreement or a notice of non-renewal is provided pursuant to Section 5.1a. Turning to the first issue, there is no evidence to support the trial court's conclusion that the letter dated June 1, 2022 constituted a material breach. Under general contract principles, as the Court knows, only a material breach of a contract will justify non-performance by the other party. The test of whether a breach is material or not is whether that breach defeats the bargain for objective of the parties. Here, the bargain for objective of the parties was the employment of Dr. Davis. Neither plaintiff nor the trial court identified the specific contractual provision that SIH is alleged to have violated on a simple act of sending the letter of June 1, 2022. And more importantly, the simple act of sending that letter certainly did not defeat the bargain for objective of the parties. To the contrary, I'll agree that both parties continued to perform the agreement for another five months. There was no material breach. Can you have a material breach and then waive that breach by continuing to perform? You certainly can. And I think it would be better classified as anticipatory repudiation, Your Honor. And I think if there is any legal significance to that letter of June 1, 2022, we look to the document for repudiation. And to the Court's question, you absolutely can waive if you continue to perform, and the repudiating party withdraws its repudiation. So let's look at the context or the substance of that June 1 letter. First of all, as we took the position of trial court, I don't believe the June 1 letter rises to the level of an anticipatory repudiation. An anticipatory repudiation requires a clear, definite, and unequivocal intent not to perform at some point in the future. Statements and actions that reveal an ambiguous intent aren't enough. So if we look at the language of the June 1 letter, granted, it is captioned as 120-day notice of termination. That is in there. But notably absent from the subscript paragraphs is any reference to a clear, definite, and unequivocal termination date. Well, it says you're not going to renew the contract. It certainly does, which, you know, I think leads to the argument that there's some ambiguity in that statement because the contract was set to expire in October 31, 2022, regardless. So I think there's an ambiguity whether it was intended to terminate earlier than the national conclusion anyway. So I don't think it rises to the level of an anticipatory repudiation. But even putting that aside, and even if we assumed that that letter, the captioned 120-day notice of termination, is enough to be an anticipatory repudiation as the trial court seems to have found here, the trial court's argument, as does plaintiff's, completely fails when you look at what happens next. When one party anticipatorily repudiates a contract, the non-breaching party has three options. The first is to rescind the contract, to immediately act, go to the court and say, I want to cancel the contract and be put back in the same position as I was before the contract even existed. Plaintiff has never taken that position. Plaintiff still doesn't take that position today. He certainly doesn't when we put back in the position he was 10 years ago. Second, the second option is that the non-breaching party can elect to treat the repudiation as a breach. And they can, therefore, either immediately go to the court and file a breach of contract action, or they're justified in changing their position in some way. For instance, plaintiff arguably could have, if he read that as an anticipatory repudiation, that this agreement was going to come to an end earlier than the contract contemplated, he could have stopped showing up to work, for instance. He could have, under Section 5.4, sent a notice to SIH terminating the agreement for cause. Under 5.3 of the agreement, rather, he could say, you've breached the contract, I'm turning it for cause. He did not do either of those things. He did not change his performance in any way. He continued to show up to work, and SIH continued to pay him accordingly. The third option in response to anticipatory repudiation appears to be what the plaintiff did here, which is to wait, to wait for a material breach to happen. If there is a repudiation at some point in the future, the breaching party isn't going to perform. The non-breaching party has the ability to wait and see what happens. That's what he did. He continued to show up to work. And the danger in doing that, the danger of continuing to perform, and as the law reads, is when you continue to perform, you are showing a willingness to proceed if SIH, the alleged repudiating party, withdraws its repudiation. That's what happened here. Plaintiff continued to work. If we look at the 2-1 letter and read it as it is captioned, 120-day notice of termination, those 120 days came and went on September 28th, 2022. When Dr. Davis showed up to work on September 29th, 2022, and continued to work from September 29th through October 31st, 2022, which was the natural conclusion, and SIH continued paying for that time, SIH has implicitly withdrawn its repudiation. The threatened breach, material breach, never came to pass. Not only was there the implicit withdrawal, there was an express withdrawal. When John Daly, the general counsel of SIMS, sent a letter to Dr. Davis on October 27th, expressly stating that the agreement would expire at its natural conclusion on October 31, 2022. So even if we read the 2-1 letter as it is per repudiation, if Plaintiff continues to show up to work, which he did, and it's undisputed, and then it's withdrawn, or repudiation's withdrawn, the contract is still in force in effect. Quite simply, the material breach that was threatened, terminated agreement prior to the conclusion of that second renewal term on October 31, never came to pass. The trial court erred in holding otherwise. I want to briefly address one additional argument that Plaintiff raised with respect to that 2-1 letter, both at the trial court level and here on appeal, namely that that 2-1 letter should be concluded as a notice of termination pursuant to Section 5.1A of the agreement. This court should reject that argument out of hand, just as the trial court did below. There are a number of issues with that argument. The first of which is that the letter does not cite Section 5.1A of the agreement. Instead, it cites a Section 5.5, a provision that applies to the ability of a physician to terminate the contract due to certain personal hardships. All agree that Section 5.5 is wholly inapplicable to this case. Plaintiff instead argues without any evidence of the author's intent that the citation to Section 5.5, as opposed to Section 5.1, was merely a scrivener's error. At the very least, that's a question of fact. A question of fact that isn't addressed in the record. The author, the COO who wrote that 2-1 letter, wasn't deposed. There's no statement as to what anyone meant. So at the very least, that's a fact question. But even if one was inclined to speculate as to what the author's intent was when he cited Section 5.5, plaintiff's argument still fails because it incorrectly characterizes the substance of Section 5.1A. Under Section 5.1A, neither party had the ability to terminate the contract. Rather, that section merely provided for written notice of intent not to renew the agreement.  Namely, Section 5.1B and then Sections 5.2 to 5.5. Secondarily, once we get past the difference between non-renewal and termination, there's another big issue, which is Section 5.1A says, or gives, a very specific time frame in which a notice of non-renewal can be sent, which is between 120 days and 90 days prior to the end of either the initial term or the first renewal term. The June 1 letter was sent 153 days prior to the end of the renewal term. It was not sent within that 90, 120-day window that's providing Section 5.1A. And then lastly, it defines... That would make it the breach, the fact that they're terminating more than 120 days? I think, Your Honor, that would be the argument's support of reading it as an anticipatory repudiation, is that they are purporting to terminate the agreement not immediately, which I think is a different set of facts. If the letter says termination effective immediately, there's an immaterial breach then and now, right? It's different here because it doesn't say that. It says 120-day notice of termination. So it's a threatened termination, which I would agree is not something that they were entitled to do at that point under the agreement. But it's an anticipatory repudiation that never came to pass because when that 120 days came and went on September 29th, Dr. Davis still showed up to work and SIH continued to pay him. So at that point, the repudiation of it is withdrawn and there was no material breach. And then the last thing on the Section 5.1A argument that's worth raising is that it defies logic to argue that anyone would ever send a notice of non-renewal anyway at the end of the second renewal term because the plain language of Section 5.1A only provides for initial five-year term followed by two renewal terms. So to send a notice of non-renewal at the end of a second renewal term would defy logic. So Section 5.1A offers plaintiff no relief on non-compete. Lastly, I want to talk about reasonableness, which is the alternative holding the trial court came to. The trial court said in the alternative, I'm going to find that the non-compete in the agreement was unreasonable. It did so despite the fact that the plaintiff never raised as an issue the reasonableness of the agreement at any point in this lawsuit, whether in his pleading, in his cross-motion for the summary judgment, it was never raised. It wasn't briefed by either party either in the summary judgment record. In coming to that holding, the trial court seemed to misapply well-established non-compete law. The Illinois Supreme Court has a long tradition of holding covenants not to compete when the limitations at the time and territory are not unreasonable. The limitations here, 24 months of not competing in a 25-mile radius, are less restrictive than covenants in similar situations that the Supreme Court has found to be reasonable. We cited both the Mohanty and the Cockrell cases. Both of those, I believe, had five-year non-competes. An examination of the record showed that the plaintiff never raised the issue of reasonableness. And in fact, as I pointed out earlier, he expressed the agreement in Section 6.4 of the agreement that those terms were reasonable. Nonetheless, the trial court here, without any briefing of the issue, held that the covenant not to compete was unreasonable, and in doing so, misapplied the three-pronged rule of reason set forth by the Illinois Supreme Court in Reliable Fire v. Eridanda. That points out a three-pronged approach to reasonableness. One is to make sure that the restrictions are greater than required to protect legitimate business interests. Then there's two more, that not to compete does not impose undue hardship on the plaintiff, and third, that it doesn't unduly injure the public. The trial court declined expressly to reach two of those three prongs, concluding that the questions of undue hardship and injury to the public were not before the court. In doing so, again, it's a misapplication of law and directly contrary to Reliable Fire help, which is that no one prong, no one factor is dispositive. It sets forth a list of factors that need to be gone through. The Supreme Court declined to do that. It relied on only one factor, the legitimate business interest, and held that, in essence, was dispositive. That is a misapplication of law under Reliable Fire. Have we... I'm going to have to cut you off there. Absolutely. Just for now. You'll have some time after the appellee gets to talk, but I see your time is up. Thank you, Your Honor. Okay. Mr. Osmond. Yes. May I please support Ms. Blaine Osmond? I'm here for the appellee, Dr. Denon Davis. In this matter, Your Honors, I would say... Mr. Osmond, I just want to ask you, why isn't this moot? Your client is working more than 25 miles away. Well, Your Honor, I think the other question that that would be is if he were to... At the time, he can work right now because Judge Goffinett has ruled that that is unenforceable. But if he were to have gone and continued to work in West Frankfurt, I think that we might be here for another issue in that they would have filed an enforcement action. But we don't have that, so I'm just wondering. I think that there's no dispute that he's working at Deaconess. Isn't that where he's working? He is currently, Your Honor, working here in Mount Vernon at Deaconess with plans to move south as soon as they set up an operation for him to be able to do that. That is my understanding. And he hopes to do that very soon. I think in reference to we filed a declaratory judgment action this year, Your Honors, so that a court could go ahead and make a decision in reference because we had a controversy and that we knew from the letter that Mr. Daley had sent that if my client would have started to practice and with Deaconess or by himself that there would have been an action that would have been filed. And so, therefore, we wanted some clarification, which is why we filed the motion, filed the action for the declaratory judgment in that issue. And the court found that there was no enforcement action pending, right? They did because he is not outside of it. They had filed for the, they being SIH, had filed with their counterclaims for an injunction. I believe actually it was Sims in that case. And then at the time, since Dr. Davis was not within that area, the judge found that that was moot at that time. So I'm wondering why the attorney fees got awarded. The attorney's fees were, the judge was very specific in that those weren't all the attorney's fees. Judge Coffin had directed us to issue to him the attorney's fees solely related to defending the counterclaim in that action because he found that you are correct, Your Honor, in that for bringing the declaratory judgment action, those fees would not be included. But in defending the counterclaims, that would have been part of the enforcement action that they had filed. So if we don't have an enforcement action, it was filed, but other parties agreed that it was not pursued, then? There was motion practice, Your Honor, in reference to the filing of the answer. So the fees were only related to that? They were, the fees were only related to the answering that specific portion. We went through diligently to make sure and then to show the judge, you know, which hours were apportioned appropriately. And we also tried to be careful so that we weren't having any type of double-dipping with that, Your Honor. Thank you. Okay. In reference to this, I believe the trial court was correct. I think that the appellant's argument that that wasn't a termination is really not correct. It's clear that it was a notice of employment agreement termination in that aspect. Once that went out, it kind of put Dr. Davis in a flux. Also, the argument as far as that he continued to work for SIMS slash SIH is correct because he also has a provision of his contract, which is provision 5.6, that he needs to continue to work with his employer and for his patients. Dr. Davis did not want to up and leave his patients. He had a large patient base. He wanted to work with his employer. And also the note from the letter from Mr. Bryant notes that they wanted to negotiate, and they were in negotiations for Dr. Davis to continue his employment. Things just didn't work out that way. In reference to as far as I believe that there was a breach, a material breach of the contract for sending that letter, there is no portion of the contract that says that SIH could essentially cancel this contract without cause. I think Your Honors correctly noted that by sending that, it did material a breach before the 120-day notice. I think one issue with sending that outside of it is it also didn't allow Dr. Davis to send a notice as far as underneath the contract that he would not be renewing his or if they wanted to enter into a negotiation. And while the court in this instance did find the breach of the contract to be material, I think also their alternate reasoning is it doesn't make sense in this aspect for that Section 5.1 that Dr. Davis could have gotten out of the non-compete at any time except for this last one. I think that that's revisionist history as far as the appellant is concerned to say that he couldn't get out of, you know, essentially get out of the non-compete by sending a notice to his employer that we need to start negotiating here in the future. I believe that's why that was put into that contract in the beginning. This case is really one that is because the appellant really started this with a very strange letter that was sent that terminated my client's employment. But then they now come back and they want to say that's really not what that was for. That was just kind of advising him that his contract would be over, which is something my client would have already known and would have been in the position to start working with them. As far as the discussion that, you know, he essentially agreed to continue working and that ruins the material breach conversation in this case, I think that that is really a non-starter because we'd be here for a whole other reason if Dr. Davis would have just pulled up shop 30 days afterwards and said I'm not going to work with you anymore. He did want to take care of his patients. He wanted to continue working. It was a very hard situation to figure out what exactly his employer wanted at that time since they were sending termination notices, but at the same time they were sending emails to him about how he needs to continue to work, how he needs to kind of negotiate with them for future employment. And only after he had notified them that he wasn't going to work any farther after the October 31st is when we get a letter from them stating that, you know, that they're going to enforce all of the elements, you know, all of the portions of the non-compete, which underneath the contract should be null. And I believe that the trial court was correct in their analysis. It was also I believe the trial court was correct in looking at the attorney's fees provision, limiting the attorney's fees provision just to the enforcement action. Of course, I did not care for that. I would rather have it all, but I would agree that judging by the contract that the trial court was correct in that ruling. Why did the trial court rule that the 25 miles in two years was unconscionable or unreasonable? Your Honor, and I'm glad you – I do not believe that's what the trial court had ruled on that one. He didn't – the trial judge did not come to the unreasonableness as much to it when you read through the specific reasoning of Judge Goffin's ruling. So you would agree that nobody argued the unreasonableness? Yes, I would agree that no one argued the unreasonableness and no one was arguing at that time that it was a court-ordered judgment action, Your Honor. It wasn't in reference to the unreasonableness of the non-compete. I believe what Judge Goffin had found essentially that he found that it was the – in the alternative that it would be greater than necessary to protect a legitimate business interest and then went into the analysis as far as it didn't make much sense to him how this by sending a notice himself on the renewal terms but couldn't for the last one. And that's where he wasn't finding – and we did not ask anything about the unreasonableness of the 25-mile range or the two-year non-compete. That would have been another question or another complaint in that aspect. Well, but when you find that it's greater than necessary to protect a legitimate business interest, that is unreasonable. Well, I think in that case, it is definitely because what comes back to with the reading of the contract, it doesn't make much sense of why you would allow a non-compete not to be in place. In this instance, a medical facility says, hey, we don't have a problem with releasing our non-compete if you send us notice on the renewals. And there's no mention in this contract that states that, well, but it will be in place if it just expires on its own or we don't send anything to you. I believe that's where Judge Goffin that was looking at his ruling is that it just did not square with the facts and put the reading of the four corners of the document and what had taken place as far as with the termination letter. But it concerns me that your client continued to work under the terms of this agreement. Well, I think that – Even though he knew that this was going to be terminated. He did continue to work. But also during that time, there was negotiations that were going on. Dr. Davis worked there for quite a long time. It was a practice that he had developed, one that he had started, and then SIH early bought in. And I think also his overall goal was to take care of his patients, Your Honor. Leaving a practice and going somewhere else is not a very easy thing to do for a doctor. Unless he took vacations. There's other instances where he couldn't be there to treat those patients. I don't think vacations would be very different, though, than leaving completely. And also there wasn't any discussion as far as – a doctor can't just pull up shop and leave. They're going to have to send out some notices. They're going to have to be able to work with their provider to let these patients know where they're going. Or an alternative, who will be stepping in to take their place for that or where to go, you know, as far as if that practice closes, where are they going to be in that case. But, I mean, Dr. Davis, if anything, was very confused by getting this letter from a notice of termination because it was just a very odd set of circumstances that he receives this. It mentions that they're going to work with him in the future to try to come up with a, quote, a new agreement. And so that's what Dr. Davis continued to do because he wanted to take care of his patients on that aspect. But the fact that he did that and negotiated and this seemed like an ongoing business arrangement, doesn't that in some ways waive the breach that the SIH did by sending the letter? No, because they hadn't backed off that they were going to continue to, at some point, terminate him in that aspect. There was never an agreement that was signed to continue on with anything. I think that that would have, if we would back up on any one of the renewal periods, for instance, at the end of the first renewal period, and they would have sent a notice or Dr. Davis would have sent a notice  or he would like to enter into negotiations, which is what this letter said, to be able to push forward. There was no thought in his mind that things couldn't be worked out for another contract in the future, which is kind of what they wanted to be able to do with those other provisions. So in that context, I do not believe that because he continued to work, I mean, he's kind of in a catch-22. I mean, if he were to quit, he might put his patients in a lurch. Of course, his employer would not be very happy with him. They would be having to scramble to have folks to cover his spot, whereas in these instances, with providing time and notice when things are going to end, you can start putting things into place to be able to take care of it in case Dr. Davis did not return to that particular provider. Your Honors, I believe that the lower court was correct in their ruling, and I'm requesting that you affirm that ruling, finding that the covenant not to compete was a material breach, and also finding that the attorney's fees that were awarded were reasonable and that they were for an enforcement action that was contemplated by the agreement. And I thank you all. Do you all have any other questions of me? Just as well. No, thank you. Thank you, Your Honors. Mr. Sands? Yes, Your Honor. There's an important public policy in Illinois, which is the freedom to contract. When a party freely agrees to restriction on its right to compete with another, as was the case here, the court should not invalidate that contract. The contract in this case was clear and unambiguous. It provided Dr. Davis the benefit of employment for an initial term of five years, followed by two renewal terms of three years each. The parties also expressly agreed that once those two renewal terms were up, the covenant not to compete would go into force and effect. The parties also expressly agreed that both the time and geographic scope limitations on that non-compete were reasonable. And although a plaintiff seeks to extricate himself from the last remaining obligation under the agreement, by signing to that letter June 1, 2022, that letter offers no support under the law. Again, the letter June 1, 2022, was not a material breach. At most, it was anticipatory repudiation. And contrary to the argument that was just made, SIH did back off because that letter said it's a 120-day notice of termination. 120 days from when that letter was sent was September 28, 2022. Dr. Davis continued to work from September 29, 2022, through October 31, 2022. SIH backed off because they continued to pay Dr. Davis. They didn't lock Dr. Davis out. They didn't stop Dr. Davis from continuing to see his patients. They continued to perform, and so did Dr. Davis. To the extent that that can be read as an anticipatory repudiation, it was withdrawn, which is exactly what Dr. Davis welcomed by continuing to work. I mean, really what happened here is you had an individual send a letter that was too early under the wrong section of the statute, of the agreement. I think that's possible, Your Honor, but I don't think the reason that the letter was sent makes a difference. Quite frankly, what makes a difference is how the parties reacted to that letter. And even if one can read that as it being sent too early and it therefore may have been anticipatory repudiation, if someone reads it that way, what the law provides is that there are certain options that the non-breaching party has in responding to that. And Dr. Davis chose not to react. He chose to continue to perform, and SIH did as well, and withdrew that repudiation, both implicitly by not kicking Dr. Davis out, locking the doors, stopping from seeing patients, still paying him, but also expressly when John Daly, the CEO of the organization, sends a letter on October 27th, specifically saying the agreement is going to come to its natural conclusion on October 31, 2022. And when we look at the actions of the parties as a whole, that seems to be what everyone thought had happened, right? Because Dr. Davis is still in good faith negotiating with SIH. Dr. Davis raises at one point during those negotiations in September, hey, if I work within 25 miles, will SIH sue me? He certainly contemplated that that non-compete was going to continue and force an effect when that agreement came to a natural conclusion on October 31, 2022, which is precisely what happened. The defense respectfully requests that this court honor the intent of the agreement, reverse the trial court, and declare that the covenant to compete is enforceable, just as the parties intended under the four corners of the agreement. Barring any further questions, I will relinquish the remainder of my time. Thank you. Thank you, Your Honor. Thank you both for your arguments here today. This matter will be taken under advisement and will issue an order in due course.